et al. Case No. 242564. Thank you. Counsel. Good morning. Good morning, your honors. May it please the court, Daniel Grace for the appellant. By applying an incorrect legal standard, the lower court's decision to grant summary judgment for the defendants in this case was fatally flawed and should be overturned by this court. Specifically, the court ignored the 2020 Supreme Court decision Bostock v. Clayton. In the lower court decision, the judge states that a plaintiff in a case such as this must show that the plaintiff's engaging in protected activities was the but Other than your client's specific remarks about his wife's, Dr. Wang's, salary, what is the specific conduct prohibited by Title VII that your client opposed? Okay, so the standard that we are viewing that in is a totality of the circumstances. You take a step back. The plaintiff himself was involved in the original salary. Take a step at where my question lands, which is what is the specific conduct prohibited by Title VII that your client opposed? The removal of the discretionary salary portion for this individual who is a member of a protected class was considered to be different, treating this employee differently to other similarly situated employees. I'm sorry, one more time. The removal of the discretionary? It's known as the ALR. During the initial salary discussions, it was noted that this was unheard of. And so the preface of my question was other than the remarks about Dr. Wang's salary. What else? It was specifically to do with removal of or failure to fund labs and failure to appropriately staff the laboratory. So have we ever actually said, I'm sympathetic, but have we ever actually held or explained that a failure to fund labs or a failure of the employer to promote diversity efforts counts as opposition under Title VII? It does, Your Honor. The opposition calls it. The answer to my question again, have we ever said that? Good question, Your Honor. And if not, why should we say that? Yes, we believe that this has not been specifically spoken to in this circuit. Obviously, the opposition clause exists in Title VII. It's very broad, but whether an overall opposition over an extended period of time to discriminatory policies within an employer. So that goes to my question. So what it seems to me that your client did here was to propose, not oppose. Propose diversity efforts, laudable as they may be, not oppose. Unless the theory is that he was in a silent way, sub silencio, opposing disparate impact. But that's not what I read in your brief. Your Honor, the plaintiff himself was hired to promote or in response to an LCMA. This is the difference between promoting and opposing. Well, there are multiple instances of opposing. For example, the Budget Committee was all male. And he advocated that females be either placed on that Budget Committee or an external gender balanced Budget Committee be created. So these were in specific responses. So there were parts of his testimony that he indicated he didn't share with other members that his efforts to promote diversity or remedy amounted to trying to combat discrimination. Does that undermine the argument that he reasonably believed he was engaging in protected activity? Well, in terms of not sharing it, he was the dean answerable to the president. So he did in his testimony state that he did provide multiple complaints and multiple examples to ODI. So let me ask the question in a different way. What is the strongest piece of evidence that you have that you think establishes that the defendants were aware that he was engaging in alleged protected activity? Well, put a different way, there's no documentation as to any other reason why he was terminated. There's scant record at all as to any other reason but these protected activities. They were aware of them because testimony of the vice president of human resources highlighted that he was aware that these positions were being created and that they could have been a part of the decision to demote him. So actual knowledge, I believe, is clear that the university were aware that he was creating these positions to gain accreditation. I'm sorry, so you think the best evidence is the testimony saying they knew he was trying to create the positions? The context of his efforts were LCME accreditation which the university required and one of the reasons that they hired him for. These were in furtherance of that accreditation which they ultimately got and mere weeks, short months after that accreditation, he was demoted. So the university were aware that the efforts he was making of which they hired him initially for were in furtherance of diversity and in opposition to discrimination. So is your argument that this alleged lack of diversity at SUNY Upstate was itself a violation of Title VII? That would, I guess, there's a standing question there. Generally, yes. I think it's, well, an individual that was affected by that would argue that that is a violation of Title VII against them. I mean, this goes back to my disparate impact question. So is it the position that the lack of diversity itself constituted clear evidence of a violation of Title VII? Well, I'm specifically speaking to the retaliation aspect here. No, I understand, but retaliation. So you've got to show some opposition. Yes. So that's my question. But the opposition is looked at, it's a broad standard and looked at in the totality of the circumstances as to whether he reasonably believed. So you can reasonably believe that an employer is engaging in discrimination but that employer ultimately not have been engaging. I'm not saying they weren't, but the standard is they don't have to be as long as you had a reasonable belief. And that reasonable belief is looked at in the totality of the circumstances. So we have eight different examples of the employee, the dean of the medical school creating and promoting diversity within the institution and being met with hurdles at every level. I have a technical question for you. The district court concluded that you effectively admitted many of the paragraphs in the defendant's 56-1 statement by failing to support your denial with a citation to the record and I was struck by that as well. So am I right in thinking that you have not contested that on appeal? I'm happy you asked that, Your Honor. And it is a resource. What can we address in our brief? We're thankful for the de novo review. Taking a look at that, for example, Can we treat those as admissions? No, absolutely not. Was the district court wrong in doing so when you failed to support it with citations to the record? No, that's not. For example, just by one non-exhaustive example, the purpose of a statement of undisputed facts is to put forward in good faith undisputed facts. The defendants put forward that a phone call, a third-party phone call took place between an individual and another individual of which the plaintiff was not a party to. Plaintiff disputes that and says, I cannot admit to that because I wasn't there. Judge rules it to be an admitted fact. But the district court noted assiduously in footnotes to its decision that the fact of the phone call was not contested and that you didn't have to admit to the substance of the phone call because you didn't have first-hand knowledge of it. But you gave no basis for believing that the phone call did not occur. It's the fact that the district court does take an extra step. And to be honest, this entire ruling takes multiple extra steps in furtherance of reaching the decision. Admits that it happened. We dispute, we say we cannot speak to it. The judge says it's admitted. If somebody expressed a feeling... Well, you didn't find testimony, for example, that the phone call did not happen. It wasn't as to the truth of the substance of the phone call. It was the fact of the phone call. Sure. And that's an example. Another example is somebody observed a particular emotion on someone's face. Now, we don't have a declaration or any testimony from the person who apparently experienced the emotion. We say we can't speak to whether someone felt an emotion when they heard something. But the observation is not whether the person felt the emotion. The assertion was the observation was made. Understood, Your Honor. But it's the fact that the judge goes a step further and admits it as a fact. These are not appropriate for a statement of undisputed facts. They shouldn't really be there. But they are. We've disputed everything that we believe is disputable that we do not agree with. And the judge has gone a step further and admitted a lot of these things, which we were, again, thankful for the de novo review of the court. We could argue we could spend all day briefing the statement of material facts or the substance of the order, which we believe is fatally flawed based on the inapplicable or failing to follow the Bostock standard. All right. And I think you've reserved some time for rebuttal, Mr. Grace. So we'll hear from you soon. Thank you. We'll hear from Counselor Fasuni of State. May it please the Court. Alexandria Twynam on behalf of Appalese. As this Court was just discussing with Plaintiff's Counsel, Plaintiff's retaliation claim fails at every step of the McDonnell-Douglas framework. The first, as the Court was just questioning Plaintiff's Counsel about, Plaintiff has failed to demonstrate a prima facie case of retaliation. None of his actions barring one or even arguably opposed a practice made illegal by Title VII. As Judge Lohier... So, I mean, so he cites to complaints his own observations of a lack of diversity to support his claims. Why are these allegations not a minimum, like at least at a minimum sufficient to support a reasonable belief he had that the treatment of diverse faculty members was discriminatory or unlawful? Because under this Court's precedent, there has to be an underlying action that is itself cognizable. And I'd point the Court towards the Wimmer case that's cited in our brief that even when racist statements were being made in a precinct because they weren't being targeted at an employee and because the Court didn't think that they were sufficient to create a hostile work environment claim, it wasn't retaliation under Title VII. Right. No, well, that makes sense. But then we... But don't... At this stage, though, does it make sense? Because, I mean, there's a difference between proving ultimately whether or not there was a hostile work environment. And we're just talking about, you know, early pleading stages here. Why wasn't it enough for... at least for him to reasonably believe that he was combating discrimination? I think the dispute that we were at an early pleading stage, this was on summary judgment, so he had his chance to get sort of the entire evidentiary record. But I think he still had to have a belief that there was an employment decision that someone had been targeted for some kind of claim, whether that's hostile work and, you know, claim towards... Well, how about a disparate impact claim? In other words, diversity efforts, and I don't think that SUNY is going to dispute the... how laudable those efforts are, diversity efforts are quite often in the face of a perceived or real disparate impact on particular protected groups. Would you agree with that? I... It's unclear to me whether this Court has held those cognizable under Title VII, but... That's not my question,  But...    But yes, I understand disparate impact can be against certain groups.  and so one way to see his efforts to promote diversity is that he was... he had a reasonable belief that there was some form of impact that was harming certain protected groups, women, for example. Is that... Is that reasonable? Is that a reasonable reading of the record? I don't think it's a reasonable reading of the record, and in particular I would say because I don't think he had any basis to say  to believe that there were individuals who believed that they were being harmed by this, and I would point, for example, to the Budget Committee where he says neither of the doctors who I proposed to be added ever indicated they wanted to be added, ever indicated that they were interested or they had been rejected from it, and I think that sort of plays out across all of his diversity efforts. If I say... I mean, you're now, I think, introducing an element into disparate impact analysis that I'm not familiar with, but if I say, and into retaliation that I'm not familiar with, but if I say, look, I think that to my boss, to my supervisor, I think that our policies are having a significant impact on women and excluding women in a way that's not necessary for the performance of whatever the job is, and I'm fired for that statement. Is that a reasonable         Is that not a form of retaliation even though no one else complained about it? It is not clear to me that it would be a Title VII retaliation. What else would it be? In this case, it may be a First Amendment retaliation claim because Upstate is a state entity. That's very... You're basically saying that we have to have an injured complainant in order for someone else. I mean, that completely flies against the theory that he would be injured being in a discriminatory environment himself. It's just a very strange... If he said that he were injured, if he said that he were injured, then he would have a direct claim, right? He would have something like a hostile... No, but I mean, the idea that you need to have somebody say, oh, I am observing that I specifically was discriminated against by not being allowed to be on this board as opposed to there is a larger systemic structure that keeps women from being on... That's just a very... I don't know that you need it to win and it's a very aggressive reading. I would agree with you that I don't think we need that to win and I would direct the court to, I think, a couple of ways in which this case is easily resolved without reaching that question. The first is, as discussed in our brief, plaintiff essentially waived his appellate arguments by failing in his opening brief to challenge any aspect of the district court's decision. Any discussion of why that was faulty came only in his reply brief. Second, on the merits, even if this court were to assume without deciding that there may be some prima facie case that could exist for promoting diversity generally, plaintiff has not disputed that he engaged in a pattern of behavior, including insubordination, financial mismanagement, and inappropriate comments that were, under this court's precedent, legitimate non-discriminatory reasons for him to be demoted. And just because you started in a particular way and you used a particular clause, which is with one exception or something along those lines when you talked about protected activity, and I took it that you were referring to the remarks about Dr. Wong's salary. Yes, Your Honor. I think that plaintiff did indicate that he believed that he had mentioned Title IX to the employer. However, as the district court found, there still would be no basis to find a prima facie case there because plaintiff had sufficient knowledge, he had direct knowledge that Dr. Wong had been paid more favorably than anyone else in the department, that her ALR from her initial letter indicated, this will be reviewed yearly and can be taken away. And in fact, that for her in particular... So it was the argument that it was not a reasonable belief based on all that? Exactly. It's not a reasonable belief. Usually, is that, usually that's not the subject, I think, of summary judgment. I think that's really up to a jury. I'm not sure that's necessarily true when the individual in question was the person who had all financial data before him. And I would say, in particularly, not only did he have knowledge to know that ALRs were regularly taken away from faculty when it had been given for the purpose of starting up their research, but also that it was particularly proper to take away Dr. Wong's research because as is sort of laid out, she was the only individual who had ever been given a research faculty position that was tenured without having gotten grants. And as Dr. Schwartz explains in his deposition, as a result of that, Dr. Wong didn't have the incentive to seek grants that an untenured faculty normally has. And so when, after multiple years, she had not gotten grants despite the express expectation that she do so, the only lever that the university had to sort of pull on to try and encourage her to do what she was obligated to do was to say, we're taking away the ALR, you will supplement your income when you get those grants. Could you take, oh, sorry. You go ahead. Could you take a minute to describe the university's position about the evidence showing its actual reasons for demoting the plaintiff? I take it that your position is that the plaintiff has not shown pretext, but there's remarkably little documentation or communication, recorded communication about performance issues. And even admitting that a dean might be in a somewhat different position than other employees, it would be helpful to me if you would review what you have showing that    the reasons were actually performance, as opposed to something in response to protected activity. Absolutely, Your Honor. So I would point you to pages three. Well, I am sorry. If I could just add one little wrinkle. The standard is not just instead of. It's alongside or was a motivating factor. So, so. But for a cause, which is greater than a motivating factor, Your Honor. But yes. So I would first point you to pages 366 and 367 of the record, which is Eric Frum,    Dr. Frost, the VP of the HR Department's initial affidavit, in which he lays out exactly what Dr. Dewan told him were the reasons that. I'm going to interject and forgive me because I've just asked you to provide an exposition of it. But, you know, Dr. Frost's testimony also was, I think it was a multitude of a lot of things. I think it could have been part of it. So his testimony was a little different from his affidavit. I'm not sure it was, Your Honor. And I think that I would point out a couple of distinctions. The first is that in his affidavit he's saying, here's what I was told by Dr. Dewan. When he is giving his deposition, he's saying, I'm not sure. I think it could have been among these factors. He's not giving an indication of where that basis is coming from, whether it is something that was told to him. And he himself was not the decision maker. So this appears to just be speculation. The second thing is that it is far from clear. But doesn't a jury decide when you have conflicting evidence which one you believe and why? I don't think that there's any conflict here. In particular, because he had stated, here's what Dr. Dewan told me. And saying later, I think it might be one of these factors I think is a separate, it's not clear that there's any contradiction in those things. But he's not saying. So your answer is that with respect to this deposition testimony from Dr. Frost, about what, that it could have been that these efforts to promote diversity could have been part of his demotion, is that it was speculative. I think that's one answer is that it's not clear where that came from because he did not make that decision to demote plaintiff. And he is not saying, I was told this by the decision makers. So it's not clear why he would have had that opinion. But the second thing is, it is far from clear that what he is saying is these efforts to promote diversity may have been a cause. What he says, the question he's asked is, were those intents part of the reason he was demoted? And what plaintiff points to is two pages earlier in the deposition when Mr. Frost had said,  there was something going on where he was assigning management confidential, i.e. non-union titles to people who are in union positions. I think he had good intentions, but he was going about it the wrong way. And the assumption that plaintiff makes is multiple pages later, those intents would clearly have referred to some sort of nebulous good intentions. So Judge Carney, I think, asked you to go through the sort of list of legitimate non-discriminatory reasons to demote him. Yes. Oh, you want me to go through the list of... Just give the strongest evidence that there was that refutes the claim that this was pretext for his oppositional activities. Sure. So I guess, is the question what evidence there is of them or what... Yeah, because there was very little documentary evidence. There were not communications. We're going to put you on a performance improvement plan or the Chancellor's expressed, you know, in writing, dismay at how you've been increasing staffing and the budget's out of control or those kind of objections to his performance that are now discussed and presented as reasons for his demotion. So I think there are four main events that happened right before he is demoted that are significant and in which there's documentation of. The first... Or three main events. The first is on August 13th when plaintiff holds an urgent 6 a.m. meeting at which he essentially just disparages President Dewan for an hour and there is deposition testimony from multiple individuals indicating sort of how uncomfortable they felt, how, you know, insubordinate this action was. The next is a few days later where plaintiff played a video at the start of a leadership meeting that included ethnic slurs and derogatory comments about Italians. And again, multiple individuals indicated in particular that an Italian-American woman who was in the meeting felt uncomfortable as a result that it was visible. And the last is the August 22nd white coat ceremony at which there were numerous emails exchanged during and afterwards about what had happened which was just several months after doctor... after plaintiff had given a speech where he had dwelled on depression and suicide among medical students and he had been told this made a lot of staff and faculty and students uncomfortable and a formal complaint was filed by a student. He went and did the same thing again. And afterwards... Am I right that this list and those are the main three? These are the most... the ones that immediately preceded him actually being demoted. There's actually a list that is laid out in our brief across over, you know, a year and a half of all of the activities he took. And there were emails about a lot of these things. For example, Mr. Frost, for example, was constantly sending emails both to plaintiff and to others within the university saying, I'm struggling here. He... Does he not contest all of this evidence? Pardon? Does he not contest the evidence that the district court relied on to find that SUNY Upstate had a legitimate non-discriminatory reason to demote him? No, Your Honor. Plaintiff not only did not contest any of these facts before the district court as evidence in the extremely thorough... or he did not properly contest any of these facts before the district court, which is laid out in the district court's summary judgment explanation of why it was accepting the facts from state respondents. But in his brief to this court,   meaning the 56.1 statement? Pardon? When you use the word properly, so I focus on your word properly. Yes. You mean the 56.1 response? Correct. That essentially, he did not sort of engage in the rules of summary judgment where he had, you know, admissible evidence that was directly contradictory to these undisputed facts. But the other thing I'd note is plaintiff did not dispute the facts here before this court. In his opening brief, he essentially does not have any recitation of the facts, does not challenge which facts he thinks the district court got wrong. He indicates he thinks that the reasons were pretextual hanging on the thin thread of, you know, the single ambiguous argument from Mr. Frost's deposition. But he does not actually challenge in that brief that any of these actions occurred. Thank you. Thank you. Thank you very much. Mr. Grace? Thank you, Your Honor. Just to touch on, twice, counselor stated that plaintiff has not, initially stated early on, has not disputed any of these facts. And then in response to one of your questions, does he dispute them? Counselor said no, he does not. Throughout his declaration, he disputes each and every one of these alleged actions. Maybe not that a meeting took place, that a class took place, but the results of it. And to Your Honor, to Your Honor's point, zero documentation out of this. No write-ups, no performance reviews, no warnings, no nothing. Secondly, to the reasonableness belief that we touched on, our standard here, the judge rules.  you say no documentation, but does he deny that concerns were expressed to him about, for example, the white coat ceremony and how he communicated with the graduating seniors and his use of the video with the racial slur? Does he contest that he was informed of concerns arising from those events? Contests that formal complaints were made. Definitely contests that. But he doesn't contest that concerns about his behavior in those contexts was communicated to him. I wouldn't, it's not admitted that there were concerns about his behavior. He contests that there were any concerns about his behavior communicated to him. There may have been communications about what occurred, but never concerns about,  you're warned of this conduct. This conduct can lead to, this is not allowed. You cannot do this. But he does not contest whether it's right or wrong. There was, there's no record of him contesting the underlying behavior. Whether or not that prompted a complaint or a message to him, he doesn't contest the underlying behavior. In the sense of, for example, the video, does not contest that a video was played.  That's fair. To the reasonableness argument, which we've touched on on plaintiff's prima facie, our standard here, the judge ruled that as a matter of law, no reasonable juror could find that his complaints as a whole or individually to the wrong salary complaint would have been reasonable. With a, quite a low bar that we have on that standard. He ruled that as a matter of law, no reasonable juror could find. And we believe that's improper. And I would just like to point out that in the overall spectrum of this case, not a single declaration or piece of testimony from the prior president, Dr. Aracarena, who has relied on heavily as to the context of plaintiff's conduct. Thank you very much. Thank you. What was your decision?